# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JULIA HAART, | ) |
| Petitioner, | ) ) ) |
| v. | ) ) C.A. No. 2022-0145-MTZ |
| SILVIO SCAGLIA, | ) ) |
| Respondent, | ) ) |
| and | ) ) |
| FREEDOM HOLDING, INC., and ELITE WORLD GROUP, LLC, | ) ) ) |
| Nominal Respondents. | ) ) |

## MEMORANDUM OPINION

Date Submitted: May 10, 2022
Date Decided: May 26, 2022
Date Issued: August 4, 2022

Henry E. Gallagher, Jr., Matthew F. Boyer, and Scott E. Swenson, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Thomas R. Ajamie, Wallace A. Showman, Ryan van Steenis, and Lewis S. Fischbein, AJAMIE LLP, New York, New York, *Attorneys for Petitioner Julia Haart.*

Rudolf Koch, Susan Hannigan Cohen, Travis S. Hunter, Kyle Lachmund, Sandy Xu, and Kevin M. Kidwell, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Peter Bicks, Lisa T. Simpson, and Marc R. Shapiro, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, New York; Emily Rae, ORRICK, HERRINGTON & SUTCLIFFE LLP, Los Angeles, California, *Attorneys for Respondent Silvio Scaglia.*

**ZURN, Vice Chancellor.**

Fashion designer Julia Haart and telecom billionaire Silvio Scaglia have a carefully curated public image supporting both their business partnership and their marriage. They met through work at a luxury fashion brand, and married in a lavish ceremony. Scaglia brought his new wife into the leadership of one of his businesses, a major model management company. Haart and Scaglia present as though they own and run that business as equals. In their free time, the couple maintains a glamorous lifestyle. They host friends and family in their sprawling Tribeca penthouse. They drive matching Bentleys. And television cameras follow their every move for Haart's Netflix reality series, *My Unorthodox Life*. But their public image differs from their formal business arrangement. That tension is the central issue in this case.

Behind the cameras and bright lights is a pair of Delaware entities. The first is the holding company for the modeling business, Elite World Group, LLC ("EWG"). The second is the couple's umbrella company, Freedom Holding, Inc. ("Freedom"), which holds EWG and the couple's other personal and business investments. Haart and Scaglia are co-owners of Freedom; Haart was an EWG director and its CEO; and this opinion assumes Haart was a Freedom director. To the public, Haart and Scaglia presented a united front, telling potential investors, other third parties, and tax authorities that they owned Freedom equally. But behind the scenes, Freedom's internal documents told a different story.

Scaglia formed Freedom and initially held all one hundred shares of its common stock. In December 2018, anticipating his marriage to Haart, Scaglia caused Freedom to issue him 123,665 preferred shares of Freedom stock. After the couple married in June 2019, Scaglia transferred Haart fifty of Freedom's common shares, but did not mention or transfer any preferred shares. In March 2020, Haart learned about the preferred shares, and demanded that the two be equal partners. In response, Scaglia executed a stock power, transferring 61,832, or 49.9995957%, of the preferred shares to Haart. Scaglia thus maintained a one-share voting advantage over Haart. Haart discovered this discrepancy as the couple's marriage deteriorated, but continued to insist she was an equal owner.

In the final moments of their marriage, Scaglia used his control over Freedom to oust Haart from her positions at Freedom and EWG; a majority of EWG's board, including Scaglia, also removed her from her positions at EWG. Haart argues that because she is an equal owner of all classes of Freedom stock, Scaglia could not unilaterally remove her from her Freedom directorship, Freedom is deadlocked, and neither Freedom nor EWG's board could remove her from her EWG roles. She brings declaratory judgment claims to resolve who controls Freedom and EWG under 8 *Del. C.* § 225 and 6 *Del. C.* § 18-110, a claim to dissolve Freedom under 8 *Del. C.* § 226, and a breach of fiduciary duty claim. Scaglia brought reciprocal counterclaims for declaratory judgments.

This post-trial opinion on the declaratory judgment and dissolution claims finds that Haart does not own half of Freedom's preferred shares, and so is not entitled to relief under any of her theories. Despite the appearance of an equal partnership, the evidence reveals that Haart never owned an equal stake of Freedom's preferred stock. For the reasons that follow, judgment is entered for Scaglia on all those counts.

## I.     BACKGROUND

This matter was tried on April 19 and 20, 2022.[1] The trial record includes over 300 joint exhibits, live testimony from three witnesses, and deposition testimony from two more witnesses.[2] I find the following facts based on a preponderance of that evidence.[3] And I limit my findings to those necessary to resolve the narrow dispute in this expedited summary proceeding.[4]

---

[1] *See* Docket Item ("D.I") 124; *see also* D.I. 57.

[2] Citations in the form "[Last Name] Tr. —" refer to trial testimony of the referenced witness, available at D.I. 127 and D.I. 128. Citations in the form "JX —" refer to the parties' joint trial exhibits. *See* D.I. 121. Citations in the form "PTO —" refer to the parties' stipulated pre-trial order, available at D.I. 119. Unless otherwise noted, I have reproduced the parties' correspondence in its original form.

[3] *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) ("The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists.").

[4] *See Nycal Corp. v. Angelicchio*, 1993 WL 401874, at *1 (Del. Ch. Aug. 31, 1993) ("An action under [Section] 225 is a summary proceeding to determine the lawful board of a Delaware corporation. . . . [I]n order to promptly and fairly address this issue, I will not consider 'collateral' issues, or those unnecessary to decide the validity of the July 23 shareholder consents, at this time." (citing *Bossier v. Connell*, 1986 WL 11534, at *2 (Del. Ch. Oct. 7, 1986)); *see also Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 201–02 (Del. 2011)

3

## A. Scaglia Acquires The Elite Businesses And Meets Haart.

Scaglia is an Italian entrepreneur and investor whose business interests span from technology to fashion.[5] In 2011, Scaglia invested in the "Elite" brand, which at the time included numerous European modeling and fashion businesses.[6] Scaglia invested in Elite through his holding company, S.M.S. Finance S.A. ("S.M.S. Finance").[7]

Scaglia also owned La Perla, a fashion and lingerie company.[8] In 2015, Scaglia, then La Perla's CEO, met Haart during a cobranding project between La Perla and Haart's business, Julia Haart Shoes.[9] Haart became a designer at La Perla and quickly took on more responsibilities.[10] In May 2016, she became La Perla's creative director, earning an approximately $2 million annual salary.[11] Haart and

---

(holding the Court of Chancery properly adjudicated who was entitled to vote disputed shares but erred in adjudicating questions of ultimate beneficial ownership in a Section 225 proceeding because such a proceeding is *in rem* and the Court lacked *in personam* jurisdiction over the litigants). *Cf. Zohar II 2005-1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 5956877, at *25–26 (Del. Ch. Nov. 30, 2017) (holding the issue of beneficial ownership was not collateral and that deciding it would not violate the parties' due process rights).

[5] *E.g.*, Scaglia Tr. 208–12, 214.

[6] *Id.* 215–17; *see* JX 9 at 2–3.

[7] Scaglia Tr. 214, 217.

[8] Haart Tr. 10, 14; Scaglia Tr. 217.

[9] Haart Tr. 10, 12–13.

[10] *Id.* 13–14.

[11] *Id.* 14–15.

4

Scaglia began dating and by early 2018, they were engaged to be married.[12] Around the time of their engagement, Scaglia sold La Perla.[13] After the sale, the buyer removed Haart from her role as creative director.[14]

### B. Scaglia Forms Freedom And EWG.

In anticipation of their June 2019 marriage, Haart and Scaglia discussed the possibility of owning and running Elite together.[15] They also hoped Elite could attract public investment via a SPAC transaction. To accomplish these two goals, Scaglia's ownership structure was modified. The plan was to form Freedom as a holding company for the couple's business ventures and personal investments, for Freedom to hold EWG, and to restructure the Elite business under EWG.

Scaglia formed Freedom on November 7, 2018.[16] Freedom's formation documents provided it would be managed by a board of directors (the "Freedom Board") and have a single class of common stock.[17] Scaglia was the Freedom Board's sole director when it was formed.[18] Scaglia was also Freedom's only initial

---

[12] *Id.* 14 ("Q. Okay. Roughly when were you engaged? A. We were trying to figure that out before all of these attacks. I think somewhere either at the end of 2017 or the beginning of 2018.").

[13] *Id.* 15; Scaglia Tr. 218.

[14] Haart Tr. 15; Scaglia Tr. 218.

[15] *E.g.*, Haart Tr. 20, 23, 134; Scaglia Tr. 238.

[16] PTO ¶¶ 33, 35; JX 10.

[17] JX 10 at 1; JX 11 at 1.

[18] JX 10 at 3; JX 11 at 3; JX 13 at 4.

stockholder, holding one hundred percent of its common shares.[19]  Among other things, Freedom held the couple's personal assets, like their apartment and vehicles.[20]

Then, Freedom acquired Scaglia's interest in S.M.S. Finance, thereby indirectly holding the numerous international entities that operated as Elite.  Scaglia contributed all his interest in S.M.S. Finance, and his interest in a loan agreement with S.M.S. Finance, to Freedom.  In exchange, Scaglia secured voting control over Freedom.  On December 28, Freedom adopted an amended certificate of incorporation, which Scaglia approved by written consents as Freedom's sole director and sole stockholder.[21]  The amended certificate empowered Freedom to issue 123,665 new shares of preferred stock.[22]  The preferred shares are convertible to a calculable number of common shares.[23] Preferred stockholders hold votes equal

---

[19] Scaglia Tr. 223; JX 12 at 3; *see also* PTO ¶ 38.  Freedom's certificate of incorporation indicates that it is authorized to issue up to 200 shares of common stock.  JX 10 at 1; JX 11 at 1.  Scaglia insists, and Haart does not dispute, that only 100 shares were ever issued. *See* D.I. 130 at 7 n.2; Scaglia Tr. 260, 307–08.  But the record contains a stock certificate issuing Scaglia 200 shares of Freedom common stock.  JX 12 at 3.  I need not resolve this discrepancy, as I find that in any case, Scaglia initially owned all of Freedom's outstanding shares.

[20] *See* Haart Tr. 22; Scaglia Tr. 229.

[21] PTO ¶¶ 37–39; JX 27 (depicting the amended certificate of incorporation); JX 30 (depicting the Freedom Board's written consent); JX 31 (depicting stockholder written consent); Scaglia Tr. 226–27.

[22] JX 27 at 1; *see also* JX 57.

[23] JX 27 at 5–6.

to the number of whole shares of common stock into which their preferred stock was convertible as of the record date.[24]  Common stockholders are entitled to one vote per share.[25]  With that capital structure, Freedom entered into a contribution agreement with Scaglia by which he contributed his S.M.S. Finance interests in exchange for all 123,665 shares of Freedom preferred stock.[26]

Next, Freedom created a wholly owned subsidiary intended to hold the Elite business.  On January 24, 2019, Freedom formed EWG.[27]  Freedom was EWG's sole member and managing member, with the authority to delegate its management powers to an agent, employee, or officer.[28]  Haart became EWG's CEO in March 2019, replacing Paolo Barbieri, one of Scaglia's business associates.[29]  On March 1, 2020, Scaglia caused Freedom to appoint Haart, Scaglia, and Barbieri to EWG's board of directors (the "EWG Board").[30]

---

[24] *Id.* at 4.

[25] *Id.* at 2.

[26] JX 29 at 1; *see also* JX 22.

[27] JX 35; PTO ¶ 34.

[28] *See* PTO ¶¶ 34, 40; JX 35; JX 50 §§ 4.1–4.2; JX 284 §§ 4.1–4.2.

[29] PTO ¶ 41.

[30] PTO ¶ 43; JX 52.

### C. Haart And Scaglia Marry And Scaglia Transfers Haart Half Of Freedom's Common Stock.

Haart and Scaglia married in June 2019.[31]  Shortly thereafter, around July 8, Scaglia executed stock certificates that transferred Haart half of Freedom's common stock.[32]  The parties agree that as of that transfer, Haart and Scaglia each owned 50% of Freedom's common stock; they also agree that the July 2019 transfer did not involve Freedom's preferred stock.[33]

Freedom and EWG began reporting in financial statements that Scaglia and Haart owned Freedom equally.  For example, EWG's 2018 pro forma financial statements stated the Elite modeling network was held by Scaglia until December 2018, when it transferred to Freedom.[34]  It went on to state that Freedom is "a US holding company owned by Silvio Scaglia (50%) and Julia Haart (50%), Group Chief Executive Officer of ELITE WORLD GROUP."[35]  On October 31, 2019, Scaglia forwarded the financial statements to a broker, copying Barbieri and Jeffery Feinman, EWG's accountant.[36]

---

[31] PTO ¶ 42.  When the pair married, Scaglia took Haart's surname and went by Silvio Scaglia Haart.  *See* JX 4 at 152, 188, 435, 458; *see also* D.I. 107 at 13.  I refer to Scaglia by his pre-marriage name as the parties have.

[32] *See* JX 279; JX 289; Haart Tr. 133–34; Scaglia Tr. 238–39, 245; *see also* JX 290 at 8.

[33] *Compare* D.I. 129 at 6, 39, *with* D.I. 130 at 11.

[34] JX 44 at 16.

[35] *Id.*

[36] *Id.* at 1 (emailing statements to a David Barnitt); *see* Scaglia Tr. 390 ("Q.  And this is what you, Mr. Scaglia, are writing to Mr. Barnitt.  And remind us again briefly, who was

Of course, the assertion that Scaglia and Haart were equal shareholders was wrong in 2018: Haart agrees Scaglia owned all of Freedom's stock until July 2019. It was also wrong in October 2019: at that point, Haart held fifty percent of Freedom's common stock, but Scaglia held all the preferred.

### D. EWG Considers A SPAC Transaction And Restructures Its Business.

With Freedom and EWG established, the parties turned to Elite's business structure, organizing those entities under EWG and separating them from Freedom's other holdings for purposes of a strategic transaction like a SPAC transaction.[37] The intended structure is shown below.

---

Mr. Barnitt? A. He was a broker that we engaged to find financing lines for Elite World Group."); Haart Tr. 42 ("David Barnitt was hired to get us a loan so that we could continue growing the business.").

[37] *See, e.g.*, Haart Tr. 192; Scaglia Tr. 257.

9



To move the Elite entities under EWG, the parties executed several entity restructuring agreements ("ERAs") at different times.[38] The first ERA was prepared by Feinman's accounting team.[39] In November 2019, the parties executed what is referred to as the "2019 ERA."[40] The 2019 ERA was backdated to April 1, 2019,

---

[38] *See* Scaglia Tr. 266–70. Haart persistently testified the ERAs transferred interests in Freedom to her as a form of "apology" from Scaglia. *E.g.*, Haart Tr. 135–36. As explained in more detail below, her version of events is not possible, so I do not credit it.

[39] *See* Barbieri Tr. 524; *see also* JX 291 at 18–19 (Feinman testifying that he did not remember who drafted the 2019 ERA but that he did not personally draft it).

[40] JX 38; JX 47 at 4–10. JX 38 is the 2019 ERA only; JX 47 includes a cover email. Haart's signature on the "assignment of membership interest" portion, the cover emails accompanying the document, and Scaglia's testimony all support a November 2019 execution date. JX 38 at 6; JX 47 at 1, 9; Scaglia Tr. 265–68. Haart conspicuously did not refute Scaglia's testimony. *See* Haart Tr. 132. She also admitted that later ERAs were backdated. *Id.* 133.

and contains errors that betray this artifice. For example, it recites that Haart and Scaglia "*were* married in June of 2019,"[41] despite being dated April 2019.

The 2019 ERA has many other flaws. It begins by reciting that Haart and Scaglia owned "One Hundred (100%) Percent of the of the [sic] Membership Interests in" EWG.[42] But Freedom owned EWG, not Haart or Scaglia. The 2019 ERA also recites that EWG owned "One Hundred (100%) Percent of the stock of all classes of the capital stock" of several Elite entities, including E. 1972, Men Women N.Y. Model Management, Inc., and Society Model Management, Inc.[43] But EWG did not own that stock: these entities were Freedom indirect subsidiaries, and the entire point of the ERAs was to transfer ownership to EWG.[44]

Next, the 2019 ERA recites that Haart and Scaglia

> agree[d] to transfer all of their Membership Interests in [EWG] to their wholly [sic] Delaware corporation known as [Freedom], and thus change the structure of ownership such that [Freedom] shall be owned 50% by each shareholder, and [Freedom] shall own all of the Membership Interests in [EWG], which in tum shall own all of the stock in [various Elite-branded business].[45]

---

[41] JX 38 at 1 (emphasis added); JX 47 at 4 (emphasis added).

[42] JX 38 at 1; JX 47 at 4.

[43] JX 38 at 1; JX 47 at 4.

[44] JX 38 at 1; JX 47 at 4.

[45] JX 38 § 1.1; JX 47 § 1.1.

Then, Haart and Scaglia agreed to "execute their appropriate assignment of Membership Interests in [EWG] in order to effectuate a transfer of the complete ownership of all Membership Interests in [Freedom]."[46] The 2019 ERA included two "assignment of membership interest" documents, which purported to transfer "any and all ownership interests [Scaglia or Haart] may own in [EWG]" to Freedom in exchange for $1.00.[47] But, again, neither Haart nor Scaglia owned any interest in EWG; only Freedom did. No similar document assigns any of Scaglia's or Haart's interests in Freedom, and no other language effectuates any Freedom transfer.

### E. Haart Learns Scaglia Owns Preferred Stock And He Executes A Stock Power.

In the spring of 2020, Freedom negotiated with Gabelli Group Capital Partners ("Gabelli") over a possible SPAC transaction for Elite.[48] Barbieri arranged a March 2020 meeting between Scaglia and Marc Gabelli, and Scaglia and Barbieri handled the negotiations from there.[49] Gabelli did not plan on retaining Haart as CEO if a SPAC deal closed.[50] Scaglia occasionally forwarded Haart emails among Scaglia, Barbieri, and Gabelli representatives.[51] Haart responded with characteristic

---

[46] JX 38 § 1.2; JX 47 § 1.2.

[47] JX 38 at 5–6; JX 47 at 8–9.

[48] *E.g.*, Scaglia Tr. 270; Barbieri Tr. 547–48.

[49] *See* JX 53 at 1; JX 54; Barbieri Tr. 547–48.

[50] Barbieri Tr. 549.

[51] JX 55 at 1–4; JX 56 at 1.

frustration that she was not included in the discussions and that they downplayed her significance to the enterprise.[52] The Gabelli transaction eventually fizzled.

During these negotiations, Haart learned for the first time that Freedom preferred shares existed, and that Scaglia owned all of them.[53] Haart testified she was "devastated" to learn that Scaglia had "misled and lied to [her]" and that he could make decisions for the business, including selling it to Gabelli, without her.[54] Haart's discovery of Freedom's capital structure compounded her frustration from being excluded from the Gabelli negotiations. On April 5, she wrote:

---

[52] JX 55 at 1 ("It doesn't mention me as CEO not even once . Just says I continue to run operations . That could be a COO for all intents and purposes and it says nothing about my running the whole company and choosing acquisitions etc.").

[53] Haart Tr. 129–32. Haart testified that she believed she first learned about the preferred shares in March 2020. *Id.* 132.

[54] *See id.* 130–31 ("Q. And you were surprised because at the time, what that meant was that Mr. Scaglia could okay and approve that deal without your involvement. Right? A. I wasn't surprised. I was devastated. Q. Okay. And at the time he told you, he said, I -- you don't have any decision-making power here, and you're not actually a 50 percent owner. Right? A. That is correct. He acknowledged that he had misled and lied to me. Yes. Q. And you were angry? A. I was devastated. . . . [A.] And that's why I was devastated to find out that he had lied to me and that, lo and behold, I was not an equal and I did not have the decision-making powers if you refer to the shares themselves, not talking about the entity restructuring agreement. Q. But you said to Mr. Scaglia, you need to make this right. You need to give me preferred shares. Correct? A. Yes. Q. You didn't say, I don't need preferred shares because I have the ERA. Right? A. I didn't need to say that, no.").

13

The fact that he has no interest in meeting me or even speaking w me says everything. No matter what the original thing that bothers him is . It's shocking to want to speak to the CFo , heads of just very specific agencies and not even once meet or speak to the CEO . It's not normal . If I had really been your partner as I thought ...if we were really 50/50 I would have been included from day 1 . I would have met him . He would have respected me and included me and I wouldn't be such a nonentity . You don't buy a company and not ask to meet or speak to the CEO . It's not normal . If you had included me from day 1 this wouldn't be the care

You chose to keep me out of it . I asked many times to meet him

And you told me no

That is not right . I do not deserve to be treated like I don't matter .[55]

Haart testified that Scaglia eventually acknowledged that Haart did not own preferred shares and apologized.[56]

Later, Scaglia endeavored to transfer preferred shares to Haart. On May 28, he texted Feinman: "Julia and I are now ready to finalize our wills and the transfer of the remaining 50% of the Freedom Holding shares tuo [sic] Julia. Please let me know when and how we can do it, All the best!!"[57] On June 3, Scaglia followed up,

---

[55] JX 4 at 448 (formatting and ellipses in original).

[56] Haart Tr. 130–31; 136. Specifically, Haart testified that the ERAs transferred the preferred stock as Scaglia's apology. *Id.* 136. This is chronologically impossible: Haart did not learn about the preferred stock until March 2020, months after the 2019 ERA was executed. *Id.* 132. And as explained below, the 2020 ERA was largely unchanged and was executed to correct errors in the 2019 ERA. Haart's testimony that Scaglia used the ERAs to apologize to Haart is not credible. And in any case, Haart's understanding of the documents' purpose does not change or overcome their plain meaning.

[57] JX 8 at 19.

14

requesting a meeting "next week" to, among other things, "execute the transfer of the preferred shares to Julia."[58] Feinman texted Scaglia on June 11 to confirm a 10:30 meeting the next day at Scaglia and Haart's home.[59]

It appears the parties followed through on this meeting. The record contains a June 12 stock power purporting to transfer from Scaglia to Haart 61,832 of Freedom's 123,665 preferred shares (the "Stock Power").[60] The Stock Power was drafted by Feinman's accounting team.[61]

The Stock Power, by its own terms, does not transfer half of Scaglia's 123,665 preferred shares. Rather, it transfers one half share less than half, or 49.9995957%, of those preferred shares. Assuming the Stock Power was effective, Scaglia continued to hold the bare majority—50.0004043%—of Freedom's preferred shares.[62] Both Scaglia and Feinman testified this structure was intentional.[63] Scaglia

---

[58] *Id.* at 20; JX 60 at 1.

[59] JX 8 at 20; JX 60 at 1.

[60] JX 61 at 5–6.

[61] Scaglia Tr. 278; JX 291 at 37.

[62] Scaglia protests that the witness line on this document was not signed and that Haart has not introduced proof that the shares were actually delivered. *See* D.I. 130 at 40–48. Scaglia also attempted to distance himself from his signature, and testified he did not specifically remember signing the Stock Power. *See* Scaglia Tr. 279–81. In this summary proceeding, I do not reach whether the Stock Power actually transferred the shares to Haart.

[63] JX 291 at 36–37; Scaglia Tr. 282, 285, 288, 290; *see also* Feinman Tr. 152. Counsel was in the habit of offering video deposition testimony as substantive proof during examinations of a different live witness. In the absence of an objection, I reluctantly accept this deposition evidence.

credibly testified he was willing to share Freedom's economic gains with Haart through common shares, but he insisted on keeping control for himself.[64]

###### F. The Parties Continue To Pursue Going Public And Execute The 2020 ERA.

EWG continued trying to go public through late 2020. After the Gabelli deal fell through, the parties' focus turned to another SPAC transaction, this time with Galileo Acquisition Corp. ("Galileo").[65] The Galileo transaction also fell through.[66] But these efforts resulted in an updated ERA that fixed some, but not all, of the errors in the 2019 ERA.

In September, during due diligence for the Galileo transaction, EWG's CFO at the time sought out "formal documentation we have regarding the transfer of the ownership" of Elite entities to EWG.[67] The CFO received the 2019 ERA in response, and realized it "contained errors" and proposed corrections.[68] The parties tried to fix

---

[64] *See, e.g.*, Scaglia Tr. 240, 253, 285–86, 290, 294–95, 319.

[65] *See* Haart Tr. 192; Scaglia Tr. 290, 448; JX 106; JX 120 at 7.

[66] Scaglia Tr. 290.

[67] JX 68 at 1.

[68] JX 83 at 1; *see also* JX 73 (depicting the CFO's handwritten draft changes). The CFO's statements and the parties' contemporaneous exchanges make it clear that the purpose of these changes was to clean up the 2019 ERA so it would be acceptable for due diligence. Again, this undermines Haart's testimony that the ERAs were an "apology" from Scaglia meant to ensure the pair's equal ownership stakes in Freedom.

16

the 2019 ERA by signing the "2020 ERA"[69] in September 2020, keeping it backdated to April 2019.[70] The 2020 ERA fixed incorrect recitals about the formation of EWG and Freedom, defined various S.M.S. Finance subsidiaries as the "Entities," and backdated Haart's signature on the assignment page.[71] It corrected the 2019 ERA's statement that EWG owned all the stock of the Elite entities, reciting that Freedom owned the relevant interests.[72] It corrected that Freedom held only a 94.12% interest in Men Women N.Y. Model Management.[73] And it corrected the tense of the recital about Haart and Scaglia's marriage, putting it in the future respective to the April 2019 backdate.[74] But the changes in the 2020 ERA did not add any language that transferred Freedom shares to Haart. The "assignment of interest" portion and descriptions of the EWG stock transfer remained substantively unchanged.[75]

---

[69] JX 290. The 2020 ERA is also reproduced in other exhibits. *See* JX 108 at 27–33; JX 183.

[70] *E.g.*, JX 68; JX 73; JX 83; *see also* JX 81 (depicting emails from September 2020); JX 82 (same); JX 94 ("Could I get you to have two people serve as witnesses and sign and send these back to me? I don't think that we have anyone here who was around in April 2019!").

[71] *See* JX 73. *Compare* JX 38, *and* JX 47 at 4–10, *with* JX 290.

[72] *See* JX 290 at 1.

[73] *See id.*

[74] *See id.* ("**WHEREAS:** The **Shareholders** are residents of New York and will be married in June of 2019;").

[75] The only changes in the "assignment of interest" were backdating and a new font. *Compare* JX 38 at 5–6, *and* JX 47 at 8–9, *with* JX 290 at 6–7. The only change in the stock

17

In addition to the documents designed to support a SPAC transaction, the parties continued to execute documents in the ordinary course of business suggesting Scaglia and Haart equally shared Freedom's stock. Examples include director and officer insurance questionaries,[76] organizational charts,[77] and statements to potential investors.[78] Most of these documents were prepared by nonparty EWG employees and contractors, including Barbieri, Feinman, and others.[79] Scaglia saw some of these documents, and failed to either notice or correct the inaccurate statements about Haart's share.[80]

---

transfer portion of the 2020 ERA is the use of a defined term, rather than list, for the various Elite-branded "Entities." *Compare* JX 38 § 1.1, *and* JX 47 §1.1, *with* JX 290 § 1.1.

[76] JX 129 at 11 (stating, in a November 2020 D&O insurance questionnaire prepared by Barbieri, that EWG was held "Silvio Scaglia 50% – Julia Haart 50%" and explaining that "In April 2019 50% of Freedom Holding shares have been transferred from Silvio Scaglia (who owned previously 100%) to Julia Hendler (now Julia Haart)"); JX 115 at 11 (same); *see also* JX 114; JX 126; JX 127.

[77] JX 174 (depicting a 2019 organizational chart showing Haart and Scaglia as each owning 50% of Freedom); JX 281 (depicting a 2020 organizational chart showing the same); JX 146 (depicting a 2021 organizational chart showing the same); *see also* JX 172 (depicting minutes of a Freedom Board meeting stating Scaglia and Haart each own 50% of Freedom).

[78] JX 160 at 3; JX 219 at 3; *see also* JX 169 at (depicting declarations to European government authorities); JX 168 (attaching JX 169).

[79] *E.g.*, JX 219 (Feinman); JX 114 (Barbieri); JX 115 (Barbieri); JX 126 (Barbieri); JX 127 (Barbieri); JX 129 (Barbieri); JX 168 (Barbieri); JX 169 (Barbieri); JX 202 (Zaffiris); JX 160 (Zaffiris).

[80] *See, e.g.*, JX 168; JX 169; JX 126; JX 127; JX 129.

### G. Haart And Scaglia's Relationship Sours And Haart Is Fired.

Haart and Scaglia increasingly disagreed about EWG's operations. In early January 2021, their disagreements focused on hiring a new CFO.[81] Haart wanted the new CFO to report to her, as the CEO, while Scaglia wanted the CFO to report directly to the EWG Board.[82] Haart resisted, telling Scaglia: "If the purpose of your proposed arrangement is because you no longer have faith in my ability to run the company, or you think I'm doing an inadequate job, then you should fire me and take over as CEO yourself."[83] She repeatedly suggested that if Scaglia was dissatisfied with her performance as CEO, he ought to take the job on himself.[84] On January 13, Scaglia proposed a meeting of the EWG Board (himself, Haart, and Barbieri) to discuss these issues.[85] A meeting was held on January 15; Haart repeatedly asked both Barbieri and Scaglia if they were "firing" her.[86]

---

[81] *E.g.*, JX 135 at 1–4; Haart Tr. 192; Scaglia Tr. 298–99.

[82] JX 135; Scaglia Tr. 299.

[83] JX 135 at 3; *see also* JX 134 at 1 (Haart emailing Barbieri: "I think it's best that I step down as CEO , and that Silvio takes over so that he can solve things his way. I'm sure he will be much more effective than I am .").

[84] *E.g.*, JX 4 at 421–25, 520–21, 535.

[85] JX 135 at 2.

[86] JX 136 at 1–2; JX 141 at 2; *see also* JX 135 at 3.

At the same time, Haart was considering divorcing Scaglia.[87] After consulting a divorce lawyer, she began to compile documents showing her interest in EWG, Freedom, and other entities.[88] Based on the documents she received, Haart definitively understood she did not own an equal stake. On January 15, Haart exchanged messages with Brian Cousin, an attorney who had previously worked with Haart and EWG.[89] Cousin asked Haart to send him core documents for Freedom, EWG, and other related entities.[90] Haart quickly forwarded Cousin's request, nearly verbatim, to Feinman.[91] Feinman responded with several attachments, including the Stock Power.[92] Haart forwarded the documents to Cousin and asked him to "look it over."[93] Meanwhile, Haart implored Feinman: "And you're sure they're iron clad and I own half of everything? 100000% sure ?," to which Feinman responded simply, "yes."[94]

---

[87] Haart Tr. 83, 152–53; *see also* Scaglia Tr. 299–300 (testifying that Scaglia did not know Haart was consulting divorce attorneys in January 2021).

[88] Haart Tr. 83–84, 152–53, 200.

[89] JX 140; Haart Tr. 153, 158; *see also* Scaglia Tr. 301.

[90] JX 140 at 1.

[91] JX 139 at 1; JX 3 at 11; *see also* Haart Tr. 202.

[92] JX 139 at 2, 3–5; JX 3 at 12, 29–31. These attachments did not include the ERAs.

[93] JX 140 at 1.

[94] JX 139 at 2; JX 3 at 12.

Minutes later, Cousin messaged Haart, pointing out that her 61,832 shares of Freedom's preferred stock are "slightly less than 50%" and stating that "[t]his will likely prove to be significant once we review the corporate operating documents."[95] Cousin also sent Haart articles about valuing a minority share in a private company.[96] Haart copied some of Cousin's messages and sent them to Feinman, pointing out that her shares were "slightly less than 50%" and asking "Does that give him more power than me ?  That he has one more share than me?"[97]  Feinman did not text back.[98]  Two days later, Haart texted Feinman:

> We reconciled and decided to try and make it work .  Just wanted you to know !  Thank uou [sic] for being so kind and patient w me on Friday .  I would still like to get all docs ... all the stuff I asked for .. as this incident just shows me how little I know[99]

In short, Haart knew no later than January 2021 that she held less than 50% of Freedom's preferred shares.[100]

---

[95] JX 140 at 1.

[96] *Id.* at 1–4.

[97] JX 139 at 2; JX 3 at 12.

[98] Haart testified that she and Feinman later discussed the issue over the phone and that Feinman reassured her that despite the one share discrepancy in the Stock Power, she had "nothing to worry about."  Haart Tr. 202–03.

[99] JX 3 at 12 (ellipses in original).

[100] Haart testified at trial that did not tell her first team of litigation counsel about the preferred stock discrepancy when she initially filed her claims in this court.  *See* Haart Tr. 187–91.

After their January 2021 reconciliation, Haart and Scaglia continued to try to take EWG public. In May, Scaglia contacted a representative from Jefferies Group ("Jefferies"), an investment bank, about backing a potential SPAC or IPO.[101] Just as with the Gabelli transaction, Haart expressed frustration that conversations with Jefferies did not respect her status in the company and that Scaglia talking to representatives one on one "set[] a very bad precedent and undermine[d] [her] authority."[102] She told Scaglia to send an email to "set things straight."[103] She suggested he say: "I want to clarify our structure prior to our meeting . Julia haart is equal co-owner with me and the CEO of elite world group . I am the non-executive Chairman of the Board ."[104] Less than six hours later, Scaglia sent an email to a Jefferies representative mirroring Haart's suggested language: "Julia and I own an equal share of EWG through own [sic] common holding company. Julia is the CEO and the real force behind EWG success and stature in the industry. I am the non executive Chairman."[105] Scaglia testified that by this statement, he was "positioning" Haart to be the point person for a deal with Jefferies.[106] He was also

---

[101] *See* JX 151; Scaglia Tr. 392–93.

[102] JX 4 at 596.

[103] *Id.*

[104] *Id.*

[105] JX 151 at 1.

[106] Scaglia Tr. 396.

hopeful that an upcoming Netflix series focusing on Haart would bring value to EWG and accelerate a potential deal.[107]

Discussions with Jefferies continued for some time,[108] but Scaglia and Haart's reconciliation did not. By spring of 2021, the pair was discussing a "friendly" divorce.[109] Those discussions continued into early 2022, turned hostile, and swelled into this litigation.

As litigation drew near, Haart worked to solidify her position within the parties' business. For example, she tried to be formally appointed to the Freedom Board.[110] For purposes of this opinion, in which I find Scaglia could validly remove Haart from the Freedom Board, I assume she was appointed in the first place.[111]

Haart remained concerned that the parties' formal documents did not make her an equal owner. She focused on convincing Feinman to parrot that she owned half of Freedom. While nominally, Feinman was EWG's accountant, he appears to have served in the role of on-call personal assistant to Scaglia and Haart, and Haart

---

[107] JX 4 at 606; Scaglia Tr. 472–73.

[108] *E.g.*, JX 167.

[109] Scaglia Tr. 297, 509.

[110] *See* Kozinn Tr. 625–27.

[111] This is consistent with other statements in the record, which suggest Haart was already on the Freedom Board. *E.g.*, JX 115 at 4–5; JX 172 at 1–2; JX 283 at 3–4; JX 57 at 1; JX 147 at 1. I note that Scaglia disputes whether Haart's efforts were successful. *See* D.I. 107 at 26–28.

texted with Feinman frequently and with familiarity.[112]  On February 5, 2022, Haart instructed Feinman that even if the documents "didn't actually make [Haart] an equal in any way," he should say that making Haart equal "was the full intention of the contract" and that Scaglia said that was so "directly in [Feinman's] presence."[113] Haart texted Feinman:

> I'm going to need you to do what you said my darling if push ever came to shove and tell the truth that the second document we signed .... it was supposed to make us equal in not only cash but in true partnership and I asked you then if I have the same rights as Silvio and you said yes and then we find out that that's not the case at all and that I do not have equal decision making ( actually no decision making rights whatsoever ) but that was def Silvios intention and what he told you to draft up.[114]

Haart tried to give Feinman a foothold for these statements, telling him they would be "the truth."[115]  She elaborated, "we all came to an agreement to finally make the shareholders agreement fair" and that Scaglia had since "reneged on everything."[116]  Haart continued leaning on Feinman after this litigation began: when Feinman complained about unpaid bills Haart owed, Haart responded "You want to get paid ?  Plz help me help you ! I cannot pay you without the truth first

---

[112] *E.g.*, JX 139 at 1–2; JX 3 at 2, 4, 8; JX 165 at 5–10.

[113] JX 165 at 5.

[114] *Id.* at 4 (ellipses in original).

[115] *Id.* at 4–5.

[116] *Id.* at 5.

coming out and being acknowledged as a 50% owner which you know better than anyone that I am ."[117]

Haart was right to be concerned about her positions at EWG and Freedom. On February 7, Scaglia and Barbieri sent Haart a letter indicating their plan to propose her dismissal as EWG's CEO at the next EWG Board meeting, scheduled for February 11.[118]  On February 8, Scaglia executed a written consent on behalf of Freedom as EWG's sole member.[119]  It resolved, in relevant part:

> **NOW, THEREFORE, BE IT RESOLVED THAT**, effective as of February 11, 2022, Julia Haart is removed from her appointment and shall no longer be a Director of the Company, while Silvio Scaglia and Paolo Barbieri shall remain in their role as Directors of the Company, until such time as any or all of them are removed by the Member.[120]

Haart, through counsel, responded with a letter to Scaglia and Barbieri later on February 8.[121]  She also executed a dueling written consent, also purportedly on behalf of Freedom as EWG's sole member.[122]  It stated that "Scaglia does not have

---

[117] *Id.* at 14.  These exchanges damage the credibility of both Haart and Feinman, particularly Feinman's statements that Haart and Scaglia were equal partners.  *E.g.*, JX 219 at 3 (Feinman stating, in a message on February 7, that "Freedom is owned by Julia and Silvio equally").

[118] PTO ¶ 44; JX 220; *see also* JX 221 (depicting an agenda for the February 11 EWG Board meeting that included a proposal to dismiss Haart as CEO).

[119] PTO ¶ 45; JX 222.

[120] JX 222 at 2.

[121] PTO ¶ 46.

[122] PTO ¶ 47; JX 223.

the authority to act on behalf of Freedom to remove Ms. Haart as a director of the Company," and resolved that "the Action by Written Consent executed by Silvio Scaglia is null and void."[123]  Scaglia responded with a letter through counsel on February 9.[124]  Also on February 9, Scaglia and Barbieri, as the EWG Board, held a meeting and voted to remove Haart as EWG's CEO.[125]  Later that day, Freedom and EWG terminated Haart's access to her EWG email and corporate credit card, and Scaglia announced that Barbieri would be taking over as EWG's CEO.[126]  Haart filed for divorce.[127]

Even after this litigation commenced on February 11, Scaglia continued to execute documents purporting to remove Haart.  On February 13, he executed a series of written consents.  The first was as the holder of the majority of Freedom's voting power, amending Freedom's bylaws.[128]  Those amendments set the size of the Freedom Board at one and the written consent removed all directors other than Scaglia.[129]  The second written consent was as the sole member of the Freedom

---

[123] JX 223 at 2.

[124] PTO ¶ 48; JX 231.

[125] JX 235 at 2; *see* Barbieri Tr. 570; *see also* D.I. 13 [hereinafter "Am. Pet."] ¶ 103 (alleging "Scaglia's and Barbieri's February 8 ouster of Haart as the CEO of EWG . . . was unlawful").

[126] PTO ¶ 49.

[127] *See* D.I. 74 ¶ 61.

[128] PTO ¶ 50(a); JX 244.

[129] JX 244 at 2; *see also* JX 247 at 8; JX 249 at 4.

Board, removing Haart from any positions she holds or ever has held at Freedom and EWG.[130]  And the third was a written consent of Freedom, as EWG's sole member, removing Haart from any position she had at EWG and appointing Barbieri as EWG's new CEO.[131]  Scaglia also filed a notice of stockholder action by written consent, explaining these measures.[132]

### H.    Haart Initiates This Litigation.

Haart initiated this action on February 11.[133]  After retaining new counsel, Haart filed an amended and supplemented petition (the "Amended Petition") on February 28.[134]  The Amended Petition asserts that Haart and Scaglia own equal fifty percent shares of all classes of Freedom stock.[135]  On that basis, Haart contends that Freedom is deadlocked and EWG's affairs are irreparably frozen.[136]  She argues Scaglia's removal of her as a Freedom director and as EWG's CEO was invalid because he did not control Freedom.[137]  Counts I and II of the Amended Petition seek declarations to that effect under 8 *Del. C.* § 225 and 6 *Del. C.* § 18-110, respectively;

---

[130] PTO ¶ 50(b); JX 245.

[131] PTO ¶ 50(c); JX 246.

[132] PTO ¶ 50(d); JX 248.

[133] D.I. 1; *see also* PTO ¶ 51.

[134] *See generally* Am. Pet.; *see also* PTO ¶ 51.

[135] Am. Pet. ¶¶ 12–13, 102.

[136] *Id.* ¶¶ 10, 117, 119.

[137] *E.g.*, *id.* ¶¶ 69, 102.

Count IV also seeks related declaratory judgments.[138]  Count III seeks judicial dissolution of Freedom under 8 *Del. C.* § 226.[139]  And Count V, which was bifurcated and has not yet been tried, asserts a claim for breach of fiduciary duty.[140]

Haart filed a motion to expedite her claims,[141] which I heard and granted on March 11.[142]  At the parties' urging, this action has proceeded quickly.[143]  On March 25, I entered a status quo order (the "Status Quo Order") stabilizing Freedom and EWG while the parties litigated their claims.[144]  The Status Quo Order declared that during the pendency of this litigation:  (a) Scaglia is the sole director of Freedom; (b) Scaglia and Barbieri are the directors of EWG; (c) Barbieri is the Chief Executive Officer of EWG; and (d) Haart holds no positions at either Freedom or EWG.[145]  It also placed limits on Freedom's and EWG's business operations.[146]

---

[138] *Id.* ¶¶ 104–08, 109–14, 122–24.

[139] *Id.* ¶¶ 115–21.

[140] *Id.* ¶¶ 115–21.  The parties agreed to stay Count V, and it was not part of the April trial. *See* D.I. 57 ¶ 11.

[141] D.I. 2; D.I. 16.

[142] D.I. 40; D.I. 41; *see also* PTO ¶ 55.

[143] *See* D.I. 57; *see also* PTO ¶ 56.

[144] D.I. 64; *see also* PTO ¶ 57.

[145] D.I. 64 ¶ 2.

[146] *Id.* ¶ 4.

Scaglia answered the Amended Petition on March 18 and filed an amended answer on March 31.[147] Scaglia denies Haart's allegations and filed two counterclaims, seeking competing declarations that his actions were valid under Section 225 and Section 18-110.[148] Haart responded to Scaglia's answer and counterclaims on April 2.[149]

This matter was tried on April 19 and 20.[150] The parties filed post-trial briefs on May 3 and agreed on May 4 that further briefing and post-trial argument were not necessary.[151] I took this matter under advisement on May 10.[152] In an effort to expedite final relief and steady Freedom and EWG, I issued an order on May 26 that vacated the Status Quo Order and entered judgment in Scaglia's favor.[153] In that order, I explained that a forthcoming memorandum opinion would detail my factual findings and legal conclusions supporting that decision. This is that memorandum opinion.[154]

---

[147] D.I. 43; D.I. 74; *see also* PTO ¶¶ 52–53.

[148] *See generally* D.I. 43; D.I. 74.

[149] *See* D.I. 78; PTO ¶ 54.

[150] *See* D.I. 124; D.I. 127; D.I. 128; *see also* D.I. 57.

[151] D.I. 129; D.I. 130; D.I. 133.

[152] D.I. 135.

[153] D.I. 140.

[154] To the extent there is a conflict between that order and this opinion, this opinion governs.

## II. ANALYSIS

"Regardless of the theory under which the removal or election of a director is challenged, the burden of proving that a director's removal or election is invalid rests with the party challenging its validity."[155] Haart bears the burden of showing Scaglia's removal of her from her board and management positions at Freedom and EWG was invalid.

In her effort to carry that burden, Haart leans heavily on her assertion that she and Scaglia equally owned "all classes of Freedom stock."[156] The parties agree this is a crucial threshold question. Haart and Scaglia equally own Freedom's common stock,[157] and Haart does not meaningfully dispute that Scaglia initially owned all Freedom's preferred stock, which he caused Freedom to issue in December 2018.[158] I find Haart did not and does not own fifty percent of Freedom's preferred stock.

From that conclusion, Haart's claims unravel. Because Scaglia has more Freedom voting power than Haart, he was able to validly execute a written consent to remove her from the Freedom Board. With Scaglia in control of Freedom, Haart

---

[155] *Kerbawy v. McDonnell*, 2015 WL 4929198, at *13 (Del. Ch. Aug. 18, 2015) (alterations and internal quotation marks omitted) (quoting *Unanue v. Unanue*, 2004 WL 5383942, at *10 (Del. Ch. Nov. 9, 2004)).

[156] Am. Pet. ¶ 12; *see* D.I. 108 at 2–3, 11, 20; D.I. 129 at 1–2, 25, 28, 46, 52, 56.

[157] *Compare* D.I. 108 at 10, *and* D.I. 129 at 6, *with* D.I. 107 at 13–14, *and* D.I. 130 at 11, *and* PTO ¶ 24.

[158] *See* D.I. 108 at 9; D.I. 129 at 6.

is powerless to stop Freedom as EWG's managing member, or Scaglia and Barbieri as two of the three members of the EWG Board, from removing her as an EWG director and EWG's CEO. And because Haart and Scaglia do not equally share control over Freedom, it is not deadlocked.

### A. Haart Did Not Own Fifty Percent Of All Classes Of Freedom Stock.

Haart has failed to meet her burden of proving she holds half of Freedom's preferred stock. The only document in the record that purports to transfer any preferred stock is the Stock Power.[159] On its face, that document contemplates a transfer of 61,832 of Scaglia's 123,665 Freedom preferred shares, giving Haart 49.9995957% of those shares.[160] There are no other documents in the record that purport to transfer any preferred shares to Haart. Thus, at best, Haart holds one preferred share less than Scaglia does, giving him voting control over Freedom.

Haart builds her case to the contrary on two general categories of documents: the ERAs and a series of other documents, which she calls "admissions" of her equal ownership.[161] I address each in turn.

---

[159] *See* JX 61.

[160] *See id.* at 5–6. Again, in this summary proceeding, I assume without deciding that this transfer was effective and do not reach Scaglia's arguments to the contrary.

[161] D.I. 129 at 8.

31

The proper interpretation of the ERAs is a question of law.[162]  Under both the 2019 ERA and the 2020 ERA, that question is governed by New York law,[163] which largely mirrors Delaware law.[164]  "Like Delaware, New York follows traditional contract law principles that give great weight to the parties' objective manifestations of their intent in the written language of their agreement."[165]  New York law seeks to give effect to the contracting parties' intent "as revealed by the language they chose to use."[166]  In doing so, New York courts, like Delaware courts, read the contract as a whole:

> It has long been the rule that a contract must be read as a whole in order to determine its purpose and intent, and single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part.  Words considered in isolation may have many and diverse meanings.  In a written document the word obtains its meaning from the sentence, the sentence from the paragraph, and the latter from the whole document.[167]

---

[162] *E.g.*, *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

[163] *See* JX 38 § 6.5; JX 47 § 6.5; JX 290 § 6.5.

[164] *See In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d 116, 144 n.126 (Del. Ch. 2020) (noting "no party has identified, and the Court is unaware of, a substantive difference between New York and Delaware law regarding the rules of contract construction" and compiling New York cases).

[165] *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 54 (Del. Ch. 2001) (compiling sources).

[166] *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (internal quotation marks omitted) (quoting *Seiden Assocs., Inc. v. ANC Hldgs., Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)); *see also Slatt v. Slatt*, 477 N.E.2d 1099, 1100 (N.Y. 1985) ("Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used[.]").

[167] *Bijan Designer For Men, Inc. v. Fireman's Fund Ins. Co.*, 705 N.Y.S.2d 30, 33 (App. Div. 2000) (citations, alterations, and internal quotation marks omitted) (citing *William C. Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418 (N.Y. 1927), and *Becker v. Peter A.*

In applying these principles to the substantially similar ERAs, I quote the more current and cleaner 2020 ERA.

Haart repeatedly points to a single clause in Section 1 of the ERAs: "**FREEDOM** shall be owned 50% by each shareholder[.]"[168] Consistent with New York law, it is important to view that clause in context. Reading Section 1 in its entirety reveals it to be nonsense, and the clause Haart relies on to be a meaningless incorrect recital.

**1.      Transfer.**

**1.1**     The **Shareholders** agree to transfer all of their Membership Interests in **ELITE** [EWG] to their wholly [sic] Delaware corporation known as **FREEDOM**, and thus change the structure of ownership such that **FREEDOM** shall be owned 50% by each shareholder, and **FREEDOM** shall own all of the Membership Interests in **ELITE** [EWG], which in turn shall own all of the stock in the **ENTITIES**.

**1.2**     Each **Shareholder** shall execute their appropriate assignment of Membership interests in **ELITE** [EWG] in order to effectuate a transfer of the complete ownership of all Membership Interests in **FREEDOM**.

**1.3**     **FREEDOM** shall execute all necessary documents to complete the transfer of its stock ownership in the **ENTITIES** to **ELITE** [EWG].[169]

---

*Frasse & Co.*, 173 N.E. 905 (N.Y. 1930), and *Eighth Ave. Coach Corp. v. City of New York*, 35 N.E.2d 907, 909 (N.Y. 1941)).

[168] JX 290 § 1.1; *see also* JX 38 § 1.1; JX 47 § 1.1.

[169] JX 290 § 1; *see also* JX 38 § 1; JX 47 § 1.

I begin with the plain language of Section 1. Section 1.1 recites that the final "structure of ownership" shall be (1) Haart and Scaglia each owning 50% of Freedom, (2) Freedom owning EWG, and (3) EWG owning the Entities. But Section 1 only prescribes transfers to accomplish the second and third parts of the structure. Section 1 promises Haart and Scaglia will transfer their EWG interests to Freedom, Section 1.1 includes an "agree[ment] to transfer" EWG shares, and Section 1.2 mandates an "assignment of Membership interest" in EWG. (As an aside, this language transferring EWG interests from Haart and Scaglia to Freedom has no practical effect: Haart and Scaglia do not own any interests in EWG.) Transferring Haart's and Scaglia's interests in EWG to Freedom would not "change the structure of ownership such that" each owned half of Freedom. Section 1 does not otherwise promise or effectuate any transfer of Freedom shares. I therefore read the clause Haart relies on to be an inaccurate recital that Haart and Scaglia already each own 50% of Freedom, in describing the final intended structure. [170]

---

[170] This is consistent with an earlier recital, which stated, "***WHEREAS***: The **Shareholders** by and between them own One Hundred (100%) Percent of the stock of all classes of capital stock in Freedom Holding, Inc. (hereinafter '**FREEDOM**')." JX 290 at 1 *see also* JX 38 at 1; JX 47 at 4. Of course, even if the parties were not equal partners, their unequal membership interests would still add up to 100%.

It is unusual and undesirable to construe contractual language to mean something that is both meaningless and false.[171]  But this inaccuracy is only one of several in in the ERAs, which appear designed more for show than substance.[172]  The 2019 ERA repeatedly confused EWG and Freedom, necessitating an updated and backdated version in 2020.[173]  While the 2020 ERA corrected some mistakes, it did not correct them all.[174]

Reading the ERAs as a whole also supports reading the clause Haart relies on as an inaccurate recital.  The ERAs were meant to reflect a transfer of the Elite-branded "Entities" from Freedom to EWG, and to ensure that EWG was fully owned by Freedom.  The 2020 ERA explains:

> *WHEREAS*:  The **Shareholders**, **FREEDOM** and **ELITE** [EWG] wish to restructure their business asset holdings such that the limited liability company, **ELITE** [EWG], shall:  (**a**) assume ownership of One Hundred (100%) Percent of the Stock **FREEDOM** owns of the **ENTITIES**; and (**b**) become a wholly owned subsidiary of **FREEDOM**; [175]

---

[171] *Cf. Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").

[172] The 2019 and 2020 ERAs contain numerous theatrical formatting choices, including the use of Comic Sans and WordArt or an equivalent.  *E.g.*, JX 38 at 1–3, 5–6; JX 47 at 4–6, 8–9; JX 290 at 1, 6–7.

[173] *See* JX 73 at 3–4; *see also* JX 83.

[174] *See* JX 73.

[175] JX 290 at 1.  The 2019 ERA makes a similar recital but does not use the defined term "Entities," and therefore does not discuss a transfer of the "Entities" in this recital.  *See* JX 38 at 1 ("*WHEREAS*:  The **Shareholders**, **FREEDOM** and **ELITE** wish to restructure

Other recitals also refer to this transaction as a "restructuring" or a "reorganization."[176] Sections 1.2 and 1.3 ensure that the documents necessary to accomplish those purposes will be executed.[177] In short, the ERAs' function is consistent with their title: restructuring the business by transferring the Entities from Freedom to EWG, and ensuring EWG was fully owned by Freedom. These tasks do not require any particular ownership of Freedom by Haart and Scaglia. The ERAs did not intend or accomplish any transfer of Freedom stock between Haart and Scaglia.

I conclude the ERAs are unambiguous on this point: their plain text simply does not transfer any Freedom shares. Under New York law, if a contract's meaning is plain and unambiguous, it will be given full effect and the Court will not consider extrinsic evidence.[178] My conclusion would therefore be the end of the inquiry.

That said, the ERAs contain many errors. If one were to conclude that those errors render the ERAs ambiguous, [179] the extrinsic evidence in the record proves the

their business asset holdings such that the limited liability company, **ELITE**, shall become a wholly owned subsidiary of **FREEDOM**;"); JX 47 at 4 (same).

[176] JX 290 at 1–2; *see also* JX 38 at 2; JX 47 at 5.

[177] JX 290 §§ 1.2–1.3; *see also* JX 38 § 1.2; JX 47 § 1.2.

[178] *See In re IBP*, 789 A.2d at 54–55.

[179] Given the choice between reading out "nonsensical" language as meaningless, and concluding it is ambiguous, New York courts have avoided surplusage and concluded the language at issue is ambiguous. *See LDIR, LLC v. DB Structured Prods., Inc.*, 99 N.Y.S.3d 327, 331 (N.Y. App. Div. 2019).

parties did not intend them to transfer any Freedom shares. Both ERAs were executed against the backdrop of potential going-public transactions.[180] Scaglia and Barbieri credibly testified that the Elite business needed to be restructured to support such a transaction, creating a formal holding company and excluding certain entities Freedom owns (like holding companies for Haart and Scaglia's home and cars).[181] The ERAs were also sent to auditors inquiring about the corporate structure behind the Elite brand,[182] and to government entities inquiring about the corporate structure behind other Elite-affiliated entities.[183] And the handwritten edits and accompanying emails focus on reorganizing the entities' structure, not Haart and Scaglia's interest in them.[184] The ERAs were drafted by nonlawyers, which helps explain their errors and inconsistencies.[185]

Haart's own narrative is extrinsic evidence that the 2019 ERA did not transfer half of Freedom's equity to her. Haart signed the 2019 ERA in November 2019,[186] but was "devastated" in March 2020 to discover the preferred stock and the fact that

---

[180] *See* Scaglia Tr. 266–67, 270–71, 383–84.

[181] Scaglia Tr. 257–58; Barbieri Tr. 592–93.

[182] *See, e.g.*, JX 177; JX 182 (attaching JX 183); *see also* JX 186.

[183] *See* JX 85 at 2.

[184] *See* JX 73; *see also* JX 83. The file name of the 2019 ERA also supports this interpretation: "Scaglia-Freedom-above-Elite Restructure-Agr.wpd." *See* JX 38; JX 47.

[185] *See* Barbieri Tr. 524, JX 291 at 18–19; JX 83; JX 73.

[186] JX 38 at 6; JX 47 at 1, 9; *see* Scaglia Tr. 266, 268.

she did not own any preferred shares.[187]  The 2019 ERA she signed could not have been the instrument she and Scaglia used to transfer half of Freedom's equity to Haart.  The Stock Power followed in June 2020, transferring Haart slightly less than half of Freedom's preferred shares.[188]  That Stock Power would not have been necessary if the 2019 ERA transferred Haart half of Freedom's stock.  And when Haart asked Feinman for documents evidencing her ownership in the shadow of a potential divorce, Feinman sent the Stock Power, and Haart focused on that document to the exclusion of the ERAs.[189]

The only extrinsic evidence suggesting the ERAs transferred Freedom stock to Haart are the insurance questionnaires Barbieri prepared and Haart and Scaglia signed.[190]  The questionnaires state, "In April 2019 50% of Freedom Holding shares have been transferred from Silvio Scaglia (who owned previously 100%) to Julia Hendler (now Julia Haart)."[191]  The 2019 and 2020 ERAs were backdated to April 1, 2019,[192] so facially, this statement suggests the ERAs effectuated this transfer.  But Haart does not contend Scaglia transferred her any preferred shares in

---

[187] Haart Tr. 130–31.

[188] *See* JX 61 at 5–6.

[189] *See supra* nn. 88–100 and accompanying text.

[190] JX 129 at 11; JX 115 at 11.

[191] JX 129 at 11; JX 115 at 11.

[192] JX 290 at 1, 6–7; *see also* Haart Tr. 133.

April 2019. In fact, Haart testified that the couple delayed transferring even the common shares to Haart until after they married in June 2019 for tax reasons.[193] Haart did not know in April 2019 that Freedom had issued preferred shares.[194] The preponderance of the extrinsic evidence proves the ERAs were intended to restructure the Elite modeling business, not reconcile the ownership of Freedom as between Haart and Scaglia. The ERAs were not intended to effectuate any transfer of Freedom shares.

Beyond the ERAs, Haart points to a series of documents that state or imply that Haart and Scaglia own Freedom in equal one-half shares.[195] To the extent Haart presents these documents to prove an unmemorialized transfer of preferred shares, I find they are insufficient to carry her burden. Documents indicating Scaglia and Haart were equal or fifty-fifty partners in Freedom appear in the record as early as 2018 and October 2019,[196] when both sides agree that statement was false. While Scaglia had transferred common shares to Haart by then,[197] he held all the preferred shares. The preponderance of the evidence indicates this trend continued uncorrected. Barbieri and other EWG employees prepared statements for Haart and

---

[193] *See* Haart Tr. 90.

[194] *Id.* 129–32.

[195] *E.g.*, JX 174; JX 281; JX 146; JX 172; JX 160; JX 219; JX 169; JX 115; JX 129; JX 202.

[196] JX 44 at 16.

[197] *See* JX 279; JX 289; Haart Tr. 133–34; Scaglia Tr. 238–39, 245.

Scaglia to review that mimicked the even split language.[198]  It appears the myth that Haart and Scaglia equally owned Freedom was widespread enough that it was repeated by EWG employees.  But these statements alone do not persuade me that Scaglia ever actually transferred any preferred stock.

Beyond those documents, some of which Scaglia signed or acknowledged, Haart also argues Scaglia directly admitted her equal share in his own words.  She points to an email where Scaglia told a Jefferies representative:  "Julia and I own an equal share of EWG through own [sic] common holding company.  Julia is the CEO and the real force behind EWG success and stature in the industry.  I am the non executive Chairman."[199]  But Haart drafted and urged Scaglia to make this statement; Scaglia was trying to appease his wife in the shadow of looming marital problems.[200]  It is not surprising that Scaglia would seek to present Haart positively in front of potential investors,[201] especially considering her upcoming Netflix show, which

---

[198] *See* JX 219 (Feinman); JX 114 (Barbieri); JX 115 (Barbieri); JX 126 (Barbieri); JX 127 (Barbieri); JX 129 (Barbieri); JX 168 (Barbieri); JX 169 (Barbieri); JX 202 (Zaffiris); JX 160 (Zaffiris).

[199] JX 151 at 1.

[200] *See* JX 4 at 596.  At this point, Haart knew about the preferred share imbalance and thus knew the statement she was asking Scaglia to make was untrue.  *See* JX 140 at 1.

[201] *See* Scaglia Tr. 396–97 ("Q.  Were you lying to the bankers or telling the bankers the truth?  A.  I was positioning Julia as the counterpart for this process. . . . And that's what you do.  I mean, when you are introducing somebody and this somebody is still trusted at that level, even if you have doubts and you're starting to accumulate issues, is you position this person as the best person in the world, to any external counterpart.").

Scaglia hoped would help facilitate a deal.[202]  In any case, Scaglia telling a potential investor that Haart was an equal partner was not far from the truth, assuming the Stock Power transferred half the preferred minus one share.  And at bottom, that statement to a third party does not transfer any stock.  The preponderance of the credible evidence in the record shows that Scaglia did not transfer Haart half his preferred shares.

Finally, Haart has known she was not an equal owner since January 15, 2021.  As discussed, she sent the Stock Power to an EWG attorney, asked for his opinion, and was told the document transferred her "slightly less than 50%" and that "[t]his will likely prove to be significant once we review the corporate operating documents."[203]  Haart panicked and texted Feinman, asking "Does that give him more power than me ?  That he has one more share than me?"[204]  Later, Haart acknowledged that Scaglia had the power to fire her from EWG.[205]  Haart understood the discrepancy the Stock Power created; she cannot tip the balance of shares in her favor by pointing to inaccuracies and puffery.

If effective, the June 2020 Stock Power transferred Haart one share less than Scaglia retained, leaving Scaglia with the power to bind Freedom by written consent.

---

[202] JX 4 at 606; Scaglia Tr. 472–73.

[203] JX 140 at 1.

[204] JX 139 at 2; JX 3 at 12.

[205] *E.g.*, JX 135 at 3.

(If the Stock Power was not effective, Scaglia held all the preferred and the power to bind Freedom.) And the 2019 and 2020 ERAs, around which Haart builds her case, do not transfer any Freedom shares. Without the ERAs, Haart is left to rely on a string of miscellaneous documents that fail to persuade me Scaglia transferred half of Freedom's preferred shares to her in those or any other transactions. In view of the preponderance of the credible evidence in the record, I conclude Haart does not own half of all classes of Freedom stock. At most, she owns half the common and less than half of the preferred.

### B. Haart's Equitable Defenses Do Not Rescue Her Claims.

Haart also asserts she is a fifty percent owner of Freedom because equitable defenses bar Scaglia from arguing otherwise. In particular, she claims: (1) Scaglia ratified agreements establishing Haart's equal ownership; (2) Scaglia acquiesced to Haart's equal ownership; and (3) Scaglia's unclean hands bar him from denying Haart's equal ownership. These principles are inapplicable here.

Haart's defenses of ratification and acquiescence both fail because there was nothing to ratify or to which Scaglia could acquiesce. "Under Delaware law, ratification is an equitable defense that precludes a party who has accepted the benefits of a transaction from thereafter attacking it."[206] Acquiescence is a closely

---

[206] *Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *11 (Del. Ch. June 8, 2020) (alterations and internal quotation marks omitted) (quoting *Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 195 (Del. 2011)).

related doctrine.[207]  It applies when a party "has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; *or* (2) freely does what amounts to recognition of the complained of act; *or* (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."[208]

Haart argues that by signing the ERA, and by his other statements, Scaglia ratified or acknowledged the parties' agreement to evenly split Freedom's shares.[209] Her position is built on her incorrect reading of the ERA and other documents.  Haart has not proven any agreement to evenly split Freedom's shares or voting power.[210] Haart has failed to carry her burden to show that Scaglia ever transferred her half of

---

[207] *See, e.g.*, *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943).

[208] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (emphasis added) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 (Del. Ch. 1998)).

[209] *See* D.I. 108 at 40–41; D.I. 129 at 46–48.

[210] Haart has not met her burden to prove that such an oral contract existed.  Whether an oral contract exists is a question of fact. *E.g.*, *Cole v. State*, 922 A.2d 354, 359 (Del. 2005). "Under Delaware law, a party asserting a breach of an oral agreement must prove the existence of an enforceable contract by a preponderance of the evidence." *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *5 (Del. Ch. Feb. 18, 2015) (citing *Grunstein v. Silva*, 2014 WL 4473641, at *16 (Del. Ch. Sept. 5, 2014) *aff'd*, 113 A.3d 1080 (Del. 2015) (ORDER)). "[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017) (internal quotation marks omitted) (quoting *Wood v. State*, 2003 WL 168455, at *2 (Del. Jan. 23, 2003) (ORDER)).  Haart has not proven she and Scaglia definitively agreed he would transfer her fifty percent of his Freedom preferred shares.

Freedom's preferred shares or made an actionable promise to do so. She offers no transaction that Scaglia could ratify or acknowledge.

Haart falls back on the argument that Scaglia should be prohibited from arguing Haart does not own fifty percent of Freedom's stock because he has unclean hands. She contends he concealed the existence of the preferred shares, surreptitiously held back one-half share in the Stock Power, and then assured Haart and others that he and she owned Freedom equally. The equitable doctrine of unclean hands "provides that 'a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim.'"[211] "[I]t is designed primarily to protect courts of equity from being misused by a party who has not acted fairly and without fraud or deceit as to the controversy in issue."[212] "The doctrine should not be seen as a means to aid a party who faces an unscrupulous opponent . . . ."[213] Rather, the operative question is "whether [a party's] conduct is so offensive to the integrity of the court that his claims should be

[211] *Portnoy v. Cryo-Cell Intern., Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008) (quoting *Nakahara v. NS 1991 Am. Tr.* (*Nakahara I*), 739 A.2d 770, 791–92 (Del. Ch. 1998)).

[212] *Patel v. Dimple*, 2007 WL 2353155, at *12 (Del. Ch. Aug. 16, 2007) (citing *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976)); *see also Portnoy*, 940 A.2d at 81 ("'[T]he purpose of the clean hands maxim is to protect the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims . . . .'" (quoting *Skoglund*, 372 A.2d at 213))).

[213] *Nakahara v. NS 1991 Am. Tr. (Nakahara II)*, 718 A.2d 518, 522 (Del. Ch. 1998).

denied, regardless of their merit."[214]  "[T]he inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought."[215] "This court has consistently refused to apply the doctrine of unclean hands to bar an otherwise valid claim of relief where the doctrine would work an inequitable result."[216]

The unclean hands doctrine does no work here.  As an initial matter, Scaglia has not meaningfully brought claims before the Court that he could forfeit.  Haart initiated this matter.  While Scaglia has counterclaimed for declaratory judgments, Haart acknowledges these are mirror images of her claims.[217]  In other words, even denying Scaglia relief under his counterclaims on unclean hands grounds would not change the conclusion that Haart has failed to carry the burden of proof on her claims.

And the exercise of looking at the litigants' hands reveals dirt on Haart's.  She was long aware of the Stock Power and the fact that Scaglia had one more preferred share than she did, going so far as to consult a lawyer who confirmed as much.[218]

---

[214] *Portnoy*, 940 A.2d at 81 (internal quotations omitted) (quoting *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. 1991)).

[215] *Nakahara II*, 718 A.2d at 523.

[216] *Portnoy*, 940 A.2d at 81 (internal quotation marks omitted) (quoting *Dittrick v. Chalfant*, 948 A.2d 400, 408 n.18 (Del. Ch. 2007)).

[217] *See* D.I. 108 at 39 n. 22.

[218] JX 140 at 1; *see* JX 139 at 2.

While litigation loomed, she attempted to pressure Feinman into falsely stating Scaglia intended to transfer her fifty percent.[219] Thereafter, she filed a petition in this Court, claiming she held half of Freedom's common shares, but neglected to mention preferred shares to her original counsel or the Court.[220] The Amended Petition, filed by new counsel, indicated she owned half of "all classes of Freedom's stock."[221] Haart testified she did not initially tell her replacement counsel about the Stock Power, on the theory that it was "irrelevant" until she found a copy of it.[222]

At bottom, nothing about Scaglia's path to this Court forecloses consideration of his claims or awarding judgment in his favor.

### C. Scaglia's Removal Of Haart As A Freedom Director Was Valid.

In Count I, Haart asserts that Scaglia could not remove her from her position as a director of Freedom "because Scaglia and Haart were 50-50 owners of Freedom, and thus Scaglia did not control a majority of Freedom's stockholder voting power."[223] She seeks a declaration to that effect under Section 225.[224] Under that provision, this Court:

---

[219] *See* JX 165 at 4–5.

[220] *See* Haart Tr. 185–88.

[221] Am. Pet. ¶ 12; *see* Haart Tr. 188–91.

[222] Haart Tr. 190.

[223] Am. Pet. ¶ 106.

[224] *Id.* ¶ 107.

> may hear and determine the validity of any . . . removal . . . of any
> director or officer of any corporation, and the right of any person to
> hold or continue to hold such office, and, in case any such office is
> claimed by more than 1 person, may determine the person entitled
> thereto[.][225]

Haart's only theory is that Scaglia could not bind Freedom because he did not have sufficient voting control.[226] As I have explained, I disagree. Because Scaglia owned at least one more preferred share than Haart, he controlled the majority of Freedom's voting power. Haart is not entitled to a declaration that Scaglia's removal of her as a director at Freedom, to the extent she ever was one, was invalid.

For the same reasons, Scaglia is entitled to a declaration under Section 225, as set forth in his first counterclaim. Judgment is entered for Scaglia on Count I of Haart's petition and on Count I of his counterclaim.

### D. The Removal Of Haart As EWG's Director And CEO Was Valid.

In Count II, Haart asserts that her removal as EWG's CEO was ineffective. "This Court has the authority under 6 *Del. C.* § 18-110(a) to hear and determine . . . the right of any person to become or continue to be a manager of a limited liability company."[227] This Court has read Section 18-110 "sensibly to sweep in sufficiently

---

[225] 8 *Del. C.* § 225(a).

[226] *See* Am. Pet. ¶¶ 104–08; D.I. 108 at 20–35; D.I. 129 at 52–53.

[227] *MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674, at *8 (Del. Ch. July 22, 2014) (internal quotation marks omitted) (quoting 6 *Del. C.* § 18-110).

related claims," like whether a disputed manager was properly removed from other corporate offices, "so long as there would be no constitutional offense."[228] Haart contends that because Freedom was EWG's managing member, Scaglia and Barbieri were Freedom's agents in their positions as EWG directors; and because Freedom was deadlocked, Scaglia and Barbieri exceeded their agency authority by removing Haart.[229] Regardless of the cogency of Haart's agency theory, it is built on a factually inaccurate premise. Because Scaglia maintained voting control over Freedom, that entity was not deadlocked as Haart contends. Without such deadlock, Haart's "disabled principal" theory fails. Freedom, as EWG's managing member, and Scaglia and Barbieri, as the majority of the EWG Board, had the power to fire Haart as CEO. Haart knew this in the days before her firing, as she repeatedly baited Scaglia with removing her and asked if she was going to be fired.[230] Haart is not entitled to a declaration that her removal was invalid, and Scaglia is entitled to a declaration that it was valid, as set forth in his second counterclaim. Judgment is entered for Scaglia on Count II of Haart's Amended Petition and on Count II of his counterclaim.

---

[228] *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *11 (Del. Ch. Mar. 31, 2003). Here, as in *Cornerstone*, there is a "close nexus" between Haart's removal as EWG's CEO and her removal from the EWG Board. *Id.*

[229] *See* Am. Pet. ¶ 112; D.I. 108 at 36–38; D.I. 129 at 53–55.

[230] JX 135 at 3; JX 4 at 421–25, 520–21, 535; JX 136 at 1–2; JX 141 at 2.

### E. Haart Is Not Entitled To Declaratory Judgments Mirroring Her Section 225 And Section 18-110 Claims.

In Count IV, Haart seeks three declaratory judgments, largely mirroring her claims under Sections 225 and 18-110:

    a. Scaglia's written consent purporting to remove Haart as a director of EWG was and is unlawful and without legal effect;

    b. The purported removal of Haart and installation of Barbieri as the CEO of EWG was and is unlawful and null and void; and

    c. Haart remains a director of EWG, and that actions taken without proper notice to Haart, proper voting, or otherwise material compliance with the Company's corporate governance were and are unlawful and null and void.[231]

These declarations mostly rehash Haart's Counts I and II. For the same reasons Haart is not entitled to relief in Counts I and II, she is similarly not entitled to declaratory judgments stating Scaglia's actions were invalid. As to Count IV's additional requested declaration that Haart was not validly removed as an EWG director, Freedom's written consent as EWG's sole and managing member removing Haart as an EWG director was effective because Scaglia had control over Freedom. Judgment is entered for Scaglia on Count IV.

---

[231] Am. Pet. ¶¶ 124(a)–(c).

### F. Haart Is Not Entitled To Relief Under 8 *Del. C.* § 226 Because Freedom Is Not Deadlocked.

Count III seeks an order appointing a custodian to manage Freedom under Section 226(a).[232] "Appointing a receiver for a solvent corporation is a radical remedy and should only be taken when the petitioning party has rather plainly shown his entitlement to it."[233]

Haart argues a custodian should be appointed over Freedom because Haart and Scaglia each own fifty percent of its stock and it is thus hopelessly deadlocked. As I have explained, Haart does not own fifty percent of Freedom's preferred shares, so voting control over that entity is not evenly split. Because Freedom is not deadlocked,[234] Haart is not entitled to relief under Section 226. Judgment is entered for Scaglia on Count III.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in Scaglia's favor on Counts I through IV of Haart's Amended Petition and on his counterclaims. The parties shall

---

[232] *Id.* ¶¶ 115–21.

[233] *In re Seneca Invs. LLC*, 970 A.2d 259, 265 (Del. Ch. 2008) (internal quotation marks omitted) (quoting *Giancarlo v. OG Corp.*, 1989 WL 72022, at *3 (Del. Ch. June 23, 1989).

[234] *See* 2 David A. Drexler et al., *Delaware Corporation Law and Practice* § 30.01, at 30-1 (2021) (defining deadlock as "the inability of the directors or stockholders to function effectively because of dissension among evenly divided interests."); *see also Mehra v. Teller*, 2021 WL 300352, at *17–19 (Del. Ch. Jan. 29, 2021) (discussing different meanings of the word "deadlocked").

confer on a plan to advance Haart's Count V and submit a proposed schedule to the

Court within twenty days.  Each side will bear its own costs.